IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARLOS PORTALATÍN ESTEVES,<br><br>Plaintiff<br><br>v.<br><br>JUAN AGOSTO ALICEA, AND HIS<br>WIFE JANE DOE, BOTH IN THEIR<br>PERSONAL CAPACITY AND AS<br>REPRESENTATIVES OF THE<br>CONJUGAL PARTNERSHIP<br>COMPRISED BY THEM;<br>CORPORACIÓN PARA EL<br>FINANCIAMIENTO DE LA VIVIENDA<br>DE PUERTO RICO; JOHN DOE AND<br>RICHARD ROE; ENTITIES A, B, AND<br>C,<br><br>Defendants | CIVIL 03-1038 (JAG) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the court on motion for summary judgment filed by co-defendants Juan Agosto Alicea (herinafter "Alicea") and Corporación para el Financiamento de la Vivienda de Puerto Rico (hereinafter "Housing Corporation") (collectively "defendants"). (Docket No. 40.) Plaintiff Carlos Portalatín Esteves (hereinafter "Portalatín") has filed a response in opposition to defendants' motion for summary judgement. (Docket No. 51.) After reviewing the arguments and for the reasons given below, I recommend that defendants' motion for summary judgment be GRANTED.

CIVIL 03-1038 (JAG)                    2

## I. BACKGROUND

On January 8, 2003, Portalatín, pursuant to 42 U.S.C. § 1983, filed a complaint of political discrimination against Alicea in his capacity as the President of the Banco Gubernamental de Fomento para Puerto Rico (hereinafter "Bank") and against the Housing Corporation, a subsidiary of the Bank, as well as several other defendants, claiming they intentionally nullified his appointment based on his political affiliation with the New Progressive Party (hereinafter "NPP") in violation of the First and Fourteenth Amendment of the Constitution of the United States of America. (Docket No. 1.) Portalatín invokes this court's supplemental jurisdiction, 28 U.S.C. § 1367, to assert a claim under the Constitution of the Commonwealth of Puerto Rico, Article II, Section 1, and Articles 1802 and 1803 of the Puerto Rico Civil Code. (Docket No. 1.) Portalatín seeks compensatory and punitive damages, reinstatement in the regular career position of Manager of Housing Administration as well as costs and attorney's fees. (Id.)

Portalatín began employment at the Bank in July 1996 as Auxiliary Director of Human Resources. Prior to this, from April 1993 to July 1996, Portalatín worked as an Executive Assistant for Pedro Figueroa, a representative for the NPP. (Docket No. 41, at 2, ¶ 2.) In February 1997, Portalatin was appointed Special Assistant IV for the Secretary of the Housing Corporation (later reclassified as Special Assistant II). (Id. at ¶ 4.) In August 1999, Portalatín was assigned as Special Aide to the Electoral Commissioner of the NPP, Pedro Figueroa. (Docket No. 41, at 2-3, ¶¶ 5-8.)

CIVIL 03-1038 (JAG)                    3

Portalatín worked as Special Aide to the Electoral Commissioner from September 1999 to March 31, 2000. (Docket No. 41, at 3, ¶ 9.) On March 31, 2000, Portalatín obtained, and on April 3, 2000 was appointed to, the position of Assistant to the Executive Director of the Housing Corporation, a trust position created by Enid Rivera (hereinafter "Rivera"), Executive Director of the Housing Corporation. (Docket No. 1, at 4, ¶ 14.)

On April 19, 2000, the Human Resources Office of the Housing Corporation posted a job vacancy announcement for the position of Manager of Housing Administration and Portalatin applied for the position. (Docket No. 41, at 4, ¶ 13.) An applicant for the position of Manager of Housing Administration had to meet one of the following sets of requirements: (1) a Bachelor's Degree in Business Administration from an accredited institution; five years of experience in the administration of projects or coordination of administrative, financial or operational processes, including two years of experience in personnel supervision, with three of the years being related to subsidized housing; being bilingual in English and Spanish; or, in its place, (2) a Master's Degree in Business Administration from an accredited institution; four years of experience in the administration of projects or coordination of administrative, financial or operational processes, including two years of experience in personnel supervision, with three of the four years related to programs of subsidized housing. (Docket No. 48, Attach. 2, at 23.)

CIVIL 03-1038 (JAG)                    4

Portalatín had a Bachelor's Degree in Business Administration and was fluent in both English and Spanish. (Docket No. 41, at 1, ¶ 1.) However, Portalatín was informed by Nadia Huertas (hereinafter "Huertas"), Director of Human Resources, that he was ineligible for the position because he "[did] not have the required job experience." (Docket No. 41, Attach. 1, at 29.) In response to this, Portalatín secured from Pedro Figueroa documentation confirming that Portalatín's duties while he worked as Special Assistant to the Election Commissioner related to subsidized housing and made him eligible for the position of Manager of Housing Administration. (Docket No. 41, at 6, ¶ 21.)

On July 10, 2000, after interviewing Portalatín in regards to his duties as Special Assistant to the Elections Commissioner, Rivera concluded that Portalatín obtained enough experience during that time to make him eligible for the position of Manager of Housing Administration. (Docket No. 48, Attach. 2, at 32-33.) Pursuant to Huertas's request, Frances Rodríguez (hereinafter "Rodríguez"), Recruiting Specialist for the Bank, reviewed Rivera's analysis regarding Portalatín's duties as Special Assistant to the Elections Commissioner. (Docket No. 41, Attach. 1, at 34.) Rodríguez concluded that Portalatín was ineligible for the position because he lacked two months experience in subsidized housing, but stated that "if the Housing Financing Corporation's Acting Director [Rivera] believes that the duties outlined above qualify mister Protalatín and the Human Resources Director [Huertas] approves it, Recruitment has no objection to accrediting him the work

CIVIL 03-1038 (JAG)                      5

experience with the State Elections Commission to complete the two month period he is lacking in the specific experience required, and certify him as an eligible candidate." (Docket No. 41, Attach. 1, at 36, ¶ 5.) On August 1, 2000, Portalatín was certified as eligible for the position of Manager of Housing Administration, a career position. (Docket No. 41, at 9, ¶ 29.) After the recruitment period was concluded, Portalatín was recommended for the position of Manager of Housing Administration. (Docket No. 1, at 4, ¶ 16.) On September 7, 2000, Portalatín was appointed to the position of Manager of Housing Administration according to a letter subscribed by Lourdes M. Rovira, president of the Bank at the time. (Docket No. 1, at 4, ¶ 16.)

According to Section 7.8.1 of the Personnel Regulations for Career Employees of the Housing Corporation (hereinafter "Personnel Regulations"), it was necessary for a probationary period of six months to pass before Portalatín could receive regular employee status. (Docket No. 41, at 9, ¶ 31.) The probationary period was set to end March 6, 2001. (Id.) However, Lourdes Rovira stated in a letter to Portalatín that because he had been carrying out the responsibilities of Manager of Housing Administration since April 3, 2000, when he worked as Assistant to the Executive Director of the Housing Corporation, Portalatin would be credited that time towards his probationary period and receive regular employee status on September 7, 2000. (Docket No. 41, Attach. 1, at 40, ¶ 2.)

CIVIL 03-1038 (JAG)                    6

In November 2000, a general election was held in Puerto Rico, and the Popular Democratic Party (hereinafter "PDP") won the Governor's office and a majority of the seats in the Senate and House of Representatives. Shortly thereafter, in December 2000, Alicea was appointed president of the Bank by the Governor. (Docket No. 1, at 5, ¶ 19.)

On February 28, 2002, Alba Caballero (hereinafter "Caballero"), an independent consultant  engaged by Alicea to investigate and analyze information pertaining to employees that may have violated Puerto Rico's electoral prohibition bar, delivered to Alicea a written report detailing the procedures followed in the appointment of Portalatín. (Docket No. 51, Attach. 16, at 11:8-26:3.) This report concluded that Portalatín's appointment was null and void for several reasons, including failure to comply with the minimum requirements set forth in the job description for the position. (Docket No. 41, Attach. 3, at 12.)

On March 4, 2002, Alicea gave Portalatín a written notice expressing his intention to nullify his appointment and discharge him from his position as Manager of Housing Administration. (Docket No. 48, Attach. 3, at 11-13.) The letter stated that Portalatín lacked the minimum requirements to occupy the position and his appointment was illegal according to administrative and legislative dispositions. (Id.) The letter further notified Portalatín of a hearing taking place on March 12, 2002, during which he could contest his discharge. (Id.) At Portalatín's request the hearing was rescheduled to March 15, 2002. (Docket No. 1, at 6, ¶¶ 23, 24.) On

CIVIL 03-1038 (JAG)                           7

April 1, 2002, Portalatín was notified in a letter subscribed by Alicea that his appointment was null because he had not complied with the minimum requirements for the position and that his termination would be effective April 5, 2002. (Docket No. 48, Attach. 3, at 15.)

Portalatin alleges the defendants targeted him because he was a member and/or sympathizer of the NPP and that they illegally and intentionally nullified his appointment based on his political affiliation. Defendants bring this motion for summary judgment claiming that plaintiff's appointment was illegal because his time as Special Aide to the Electoral Commissioner did not relate to programs of subsidized housing and so he did not meet the requirements of the position. Defendants additionally aver that accreditation of the time Portalatin worked as Assistant to the Director of the Housing Department towards his probationary period as Manager of Housing Administration was illegal.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c) (2003). As the moving party, defendants must show there is insufficient evidence for plaintiff to support his claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The burden then shifts to the plaintiff to set forth specific facts, in suitable evidentiary form, to

CIVIL 03-1038 (JAG)                    8

establish there is a genuine issue of material fact for trial and that the jury could reasonably find in his favor. López-Carrasquillo v. Rubianes, 230 F.3d 409, 413 (1st Cir. 2000). A fact is considered material if it has the potential to affect the outcome of the case under applicable law. Nereida-González v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). Plaintiff cannot rely upon conclusory allegations, improbable inferences, and unsupportable speculation. López-Carrasquillo, 230 F.3d at 413. If the facts, taken in the light most favorable to Portalatín, do not create a genuine issue of material fact regarding his ability to make out a claim of political discrimination, summary judgment is proper. Id.

    As defendants point out, Portalatín has ignored Local "anti-ferreting" Rule 56(c) in his "Statement of Facts Contesting Defendants' Alleged Uncontested Material Facts." (Docket No. 59, at 3; Docket No. 52; Local Rule 56(c)). Rule 56(c) clearly provides that in opposing statements of material facts, the opposing party, in their opposing statement, "shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation. . . . The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation." Local Rule 56(c). Plaintiff instead has submitted only the latter, presenting facts that do not make reference to the numbered paragraphs of defendants' summary judgment motion. Rule 56(e) clearly states that facts "shall

CIVIL 03-1038 (JAG)                    9

be deemed admitted unless properly controverted." Portalatín's "Statement of Fact Controverting those Presented by Defendants" does not properly controvert the facts presented by the defendants and so this court has no choice but to accept the defendants' "Statement of Uncontested Facts" (Docket No. 41) as controlling in their motion for summary judgment. Cosme-Rosado v. Serrano-Rodríguez, 360 F.3d 42, 45 (1st Cir. 2004); Corrada Betances v. Sea-Land Service, Inc., 248 F.3d 40, 43-44 (1st Cir. 2001).

### A.  Claim of Political Discrimination under 42 U.S.C. § 1983

A claim under 42 U.S.C. § 1983 must present sufficient evidence to show that (1) the action complained of was committed by a person acting under the color of law and (2) that such conduct worked a denial of rights secured by the Constitution or by federal law. Herbal Sensations, Inc. v. Rivera, 270 F.Supp. 2d 234, 240-41 (D.P.R. 2003) (quoting Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997)). "The second element requires the plaintiff to prove not only a deprivation of a federal right, but also that the defendant's conduct was a cause in fact of the alleged [violation]." Soto v. Flores, 103 F.3d at 1062.

The Supreme Court has held that dismissing public employees in non-policymaking positions, solely for their political affiliation and despite their satisfactory work performance, violates the First Amendment because political patronage tends to improperly coerce employees into compromising their true beliefs and has the effect of imposing an unconstitutional condition on the receipt of a

CIVIL 03-1038 (JAG)                    10

public benefit.  <u>Elrod v. Burns</u>, 427 U.S. 347, 367 (1976).  The Court further clarified that as an alternative to showing the discharge was from a confidential or policymaking position, the hiring authority may simply demonstrate that party affiliation is an appropriate requirement for the effective performance of the position involved.  <u>Branti v. Finkel</u>, 445 U.S. 507, 517 (1980).

In this case the defendants assert that not only has Portalatín failed to establish a prima facie case of political discrimination but that even assuming he succeeds in such, they have shown they would have discharged him regardless of his political affiliation with the NPP.  According to the defendants, Portalatín failed to meet the requirements for the position of Manager of Housing Administration and so was illegally appointed in violation of the Personnel Regulations and the merit principle embodied in Puerto Rico's Public Service Personnel Act, P.R. Laws Ann. tit. 3, § 1301 et seq., making the appointment null.

<u>1.  Prima Facie Case under 42 U.S.C. § 1983</u>

As to the prima facie case, defendants claim Portalatín fails to identify specific instances that support his allegations that Alicea's sole motive in discharging Portalatín was to discriminate against him because of his political affiliation with the NPP.  I agree.

A prima facie case of political discrimination is established by demonstrating that plaintiff (1) engaged in protected conduct and (2) that such conduct was a substantial or motivating factor in the adverse employment decision.  <u>Guzmán-Ruiz</u>

CIVIL 03-1038 (JAG)                    11

v. Hernández-Colón, 406 F.3d 31, 34 (1ˢᵗ Cir. 2005).  In other words, Portalatín must prove that his political affiliation was a substantial or motivating factor in his discharge if he is to survive defendants' motion for summary judgment.

Circumstantial evidence may be used to support a finding that political discrimination was a substantial or motivating factor behind a plaintiff's dismissal. Flores Camilo v. Álvarez Ramírez, 283 F. Supp. 2d 440, 448 (D.P.R. 2003) (citing Estrada-Izquierdo v. Aponte-Roque, 850 F.2d 10, 14-15 (1ˢᵗ Cir.1988)).  "The operative question . . . is 'does the circumstantial evidence, taken as a whole, give rise to a plausible inference of discriminatory animus which, ultimately possesses enough convictive force to persuade a rational fact-finder that the defendants' conduct was politically motivated?'" Flores Camilo v. Álvarez Ramírez, 283 F. Supp. 2d at 448 (quoting Anthony v. Sundlun, 952 F.2d 603, 606 (1ˢᵗ Cir. 1991)).

"Factors that have been found to show discriminatory animus include the fact that the plaintiff was a known member of the opposing political party, that the position was then filled by a member of the opposite political party, and that everyone of the plaintiff's party was demoted after a change in office." Flores Camilo v. Álvarez Ramírez, 283 F. Supp. 2d at 448.  In Hiraldo Cancel v. State Ins. Fund. Corp., 326 F. Supp. 2d 286, 294-95 (D.P.R. 2004), plaintiff was able to survive defendant's motion for summary judgment by presenting evidence that she was affiliated with and actively participated in the political party, that her political views were known to defendants who were members of the rival political party, and that

CIVIL 03-1038 (JAG)                    12

her replacement was a sympathizer of the rival party who had remarkably less experience and credentials.  However, Portalatín has not shown that Alicea knew of his political views, that all the discharged employees were NPP members, and has not presented any evidence to show they were replaced by PDP members.

Portalatín argues it would be unlikely defendants could be unaware of his political affiliation because Portalatín had been "more than involved in activities regarding his political beliefs" and "[i]t was no mystery to the people who worked around him" that he was an NPP.  (Docket No. 51, at 4, ¶ 1.)  As support for this allegation, Portatalatín testified that "where [he] came from is public knowledge" and that he "have never hid [his] political affiliations anytime. . . ." (Docket No. 61, Attach. 1, at 3:10, 3:14.) However, that does not establish that Alicea was aware of Portalatín's political affiliation.

In González de Blasini v. Family Dep't, 377 F.3d 81, 85-86 (1st Cir. 2004), the First Circuit concluded that even though the plaintiff was alleged to be a well known supporter of the NPP, had held a trust position under the previous NPP administration, and defendant had expressed an interest in replacing plaintiff with a PDP member, this fell short of evidence that the defendant knew of plaintiff's political affiliation.  Portalatín's allegations that his political affiliation was simply public knowledge and therefore Alicea was aware of it, obviously fairs worse than all the evidence presented in González Pina, and fails to establish Alicea's knowledge of Portalatín's political affiliation.

CIVIL 03-1038 (JAG)                    13

In his deposition, Portalatín testified that his supervisor, Carmen Alvarado, and Alicea had a telephone conversation where Alicea asked Alvarado if Portalatín had been "forcefully imposed" in the Manager of Housing Administration position. (Docket No. 48, Mot. Submitting Certified Translations, Attach. 1, at 5:2-6:5.) Alvarado, however, denied that such a conversation occurred. (Docket No. 48, Attach. 1, at 16:1-16.) Although this presents a factual dispute, the fact is not a material one which will ward of defendants' motion for summary judgment. If Alicea did indeed discuss the imposition of Portalatín's appointment with Alvarado, it does nothing to show that Alicea discharged Portalatín due to his political affiliation or that Alicea knew of Portalatín's political affiliation; only that Alicea inquired about the way in which Portalatín was appointed into his position.

Portalatín claims that all the appointments being audited and disqualified by the new administration were those appointed by the NPP administration. (Docket No. 61, Mot. Submitting Certified Translations, Attach. 1, at 9:19-11:6.) However, in his deposition Portalatín continuously qualifies his answer. First he states that "they disqualified all of us who are members of the [NPP]." (Id. at 10:1.) Then he states that at least the ones he knew about at the bank that were discharged were NPP members. (Id. at 10.) Finally, out of the four allegedly politically motivated discharges he knows about, he is unsure as to what the political affiliation is of María Rodríguez, one of the employees who was discharged along with himself and three others. (Id.) If both PDP and NPP members were discharged from their

CIVIL 03-1038 (JAG)                    14

positions, then Portalatín's prima facie case of political discrimination falls short of the mark.

Portalatín also stated that the new administration limited his resources, but failed to make a connection as to how these were motivated solely by the administration's disdain for his political affiliation.  Portalatín testified that two independent contractors under his supervision had their contracts discharged and that overtime was cut to those appointed to undertake that work.  Then, once Portalatín's appointment was declared null, petitions regarding increases in personnel and resources were fulfilled.  (Docket No. 61, Attach. 1, at 7:3-5.)  If the record showed that the person who replaced Portalatín was a PDP, and his petitions for increased resources were granted, then perhaps this could be evidence of political discrimination.  Likewise, Portalatín testified that per diems and mileage expenses were denied to his employees.  However, as Portalatín admitted in his deposition, not only were members of both the PDP and the NPP denied per diems and mileage, but Portalatín himself was never denied either per diems or  mileage.  As it stands, Portalatín makes no connection between his discharge and political affiliation and only disables his prima facie case with his testimony.

None of these facts show that Portalatín was discharged due to his political affiliation.  Even if the evidence is taken as a whole, it does not give rise to a plausible inference of political animus. Portalatín's failure to make a connection between the administration's actions and his claim of political discrimination, and

CIVIL 03-1038 (JAG)                    15

the general inconsistency of his own testimony regarding the administration's alleged political motivated actions, fatally handicap Portalatín's prima facie case.

### 2. Discharge Regardless of Politcal Affiliation

Defendants argue that even if Portalatín does establish a prima facie case, defendants' can successfuly show that they would have discharged Portalatín regardless of his political affiliation. Defendants claim that Portalatín's appointment was an "outright violation of the Personnel Regulations of the [Housing Corporation] and the merit principle. . . ." (Docket No. 40, at 6, ¶ 3.) I agree.

Defendants may rebut a prima facie case of political discrimination by articulating nondiscriminatory grounds for adverse employment action, and showing they would have taken adverse employment action regardless of plaintiff's political affiliation. Mt. Healthy City Sch. Dist. Bd. of Educ., 429 U.S. 274, 287 (1977); Quiñones Colón v. Calderón, 371 F. Supp. 2d 84, 87-88 (D.P.R. 2005). "[E]ven if a plaintiff meets his or her initial burden of showing that political affiliation was a motivating factor for an employment decision, that is insufficient to establish discrimination as a matter of law because the plaintiff's case at that point does not 'distinguish [ ] between a result caused by a constitutional violation and one not so caused.'" Sánchez-López v. Fuentes-Pujols, 375 F.3d 121, 131 (1st Cir. 2004) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 286). However, the "new administration cannot use the nullity of appointments as a pretext for political discrimination. . . ." Cardona Martínez v. Rodríguez Quiñones,

CIVIL 03-1038 (JAG)                    16

306 F. Supp. 2d 89, 94 (D.P.R. 2004) (citing <u>Acevedo-Díaz v. Aponte</u>, 1 F.3d 62, 68 (1st Cir. 1993)).

Defendants' reasons for considering Portalatín's appointment null and void arise directly from Caballero's report.   Caballero's report concluded that (1) Portalatín lacked four and a half  months experience for the position of Manager of Housing Administration, (2) the accreditation of his time as Assistant to the Executive Director of the Housing Corporation to his probationary period as Manager of Housing Administration was null, and (3) Portalatín's status change from Assistant to the Executive Director of the Housing Corporation to Manager of Housing Administration required the authorization of an administrator from the Central Office for Labor Consulting and Human Resources Administration (hereinafter "OCALARH" for its Spanish acronym).  We take each point in turn.

First is the uncontested fact that Portalatín did not meet the experience requirements of the position of Manager of Housing Administration.  Defendants contend that Portalatín's time as Special Assistant to the NPP Elections Commissioner did not relate to public or subsidized housing and so could not be used to fulfill the requirement of "three years of project management or coordination of administrative, financial, or operational processes related to subsidized housing programs."  Indeed, Huertas had made Portalatín ineligible for the position of Manager of Housing Administration for this very reason.  However, Portalatín managed to obtain a letter from the Elections Commissioner certifying

CIVIL 03-1038 (JAG)                    17

that Portalatín's position as Assistant to the Elections Commissioner in fact dealt with subsidized housing.  Rivera then evaluated the letter from the Elections Commission, interviewed Portalatín and qualified him as eligible for the position of Manager of Housing Corporation.  Rodríguez then reviewed Rivera's analysis and found that Portalatín still lacked two months experience for the position, but concluded that if Rivera believed Portalatín was qualified, and Huertas believed he was qualified, then she had no objection to him being certified as eligible to the position. The question then is: can an individual be eligible for a position if he lacks the experience necessary, but is certified as eligible by those reviewing his application?  The answer is no.

The Personnel Regulations for Career Employees at the Housing Financing Corporation (hereinafter "Personnel Regulations") make it clear that for candidates to be eligible for a career position they must meet the requirements set forth in the job vacancy announcement.  (Docket No. 48, Attach. 1, at 37 - 44.)  Section 7.3.2.2 (id. at 39) states that "[a]pplications will be rejected for any of the following reasons:  . . . failure to meet the minimum requirements established to fill the position;" section 7.5.3 (id. at 41) that "[t]he eligibility of people listed in the registries will be eliminated for any of the following causes:  . . . failure to submit evidence required concerning minimum requirements or the submission of evidence indicating he or she does not meet the minimum requirements;" and section 7.7.1 (id. at 44) that "candidates' compliance with the requirements . . . will be

CIVIL 03-1038 (JAG)                    18

verified. . . ."  However, there is no provision in the Personnel Regulations allowing the Executive Director of the Housing Corporation, Director of Human Resources or the Recruiting Specialist for the Bank to appoint someone to a position for which he does not meet the requirements.

Even if Portalatín's time as Special Assistant to the Elections Commissioner had properly fulfilled the requirements for Manager of Housing Administration, Rodríguez's letter made it clear  he was still two months short of the three year requirement for projects concerning subsidized housing.  Portalatín's appointment is null.

Second, defendants point out two problems with the accreditation of Portalatín's time as Assistant to the Executive Director of the Housing Corporation to his probationary period as Manager of Housing Administration.  Defendants first contend that time from a trust position cannot be accredited to a career position as was done here.  Defendants then contend that the time itself was insufficient to complete the probationary period.  Ultimately, however, the regulations governing the accrediation of time from prior positions do not allow Portalatín's accreditation because he did not meet the requirements of Manager of Housing Administration.

Defendants aver that the Corporation's Personnel Regulations for Career Employees apply only to career service employees, and so Portalatín's time as Assistant to the Executive Director of the Housing Corporation, a trust position, cannot be accredited to his probationary period as Manager of Housing

CIVIL 03-1038 (JAG)                    19

Administration, a career position.  I agree, however, the Personnel Regulations do not so clearly outline the exclusion of trust employees from accreditation.

The Personnel Regulations clearly provide that time from temporary, non-career positions may be accredited to career positions' probationary period.  Section 7.8.9 provides that "[i]f the person appointed has satisfactorily performed the duties of the position under a temporary appointment, he or she may receive credit on the probationary period. . . ."  (Docket No. 48, Attach. 1, at 46 (emphasis added).) Section 7.9 provides that "[a]ny position created for a fixed period of time will be one of temporary nature." (Id. (emphasis added).) Section 7.9.6 then provides that "employees with temporary appointments will not be considered career employees." (Id. (emphasis added).)  It is very plain the Personnel Regulations allow the time employees spend in a temporary position to be accredited to the probationary periods of career positions with the same responsibilities.

Section 7.8.10, on the other hand, does not use the words "temporary employment" but instead refers to "performing the duties of the position on an interim basis" as appropriate for accreditation of that time to the probationary period of a career position. (Id. (emphasis added).) Unfortunately, the Personnel Regulations are not clear on what performing duties on an "interim basis" entails. More importantly, nowhere does it allow or preclude these duties to be served during a trust position. However, seeing as the Personnel Regulations are specifically inclusive of temporary, non-career, positions, but completely silent as

CIVIL 03-1038 (JAG)                    20

to trust, non-career, positions, the construction of the Personnel Regulations implies that the only non-career positions that will be allowed accreditation are temporary positions.

Rovira therefore incorrectly references section 7.8.10 to accredit Portalatín the time he worked as Assistant to the Executive Director of the Housing Corporation to the probationary period of Manager of Housing Administration. (Docket No. 41, Attach. 4, at 19.)  Therefore, Portalatín's appointment was null because he was improperly accredited time from a trust position instead of a career position or a temporary position.

Defendants also point out that if Portalatín's time while he worked as Assistant to the Executive Director of the Housing Corporation was to be accredited to his six month probationary period as Manager of Housing Administration, then the probationary period would expire October 3, 2000, not September 6, 2000. (Docket No. 40, at 14.)  Indeed, Portalatín received a letter on September 6, 2000, informing him of his appointment to Manager of Housing Administration (Docket No. 41, Attach. 1, at 40); however, that is not a violation of the Personnel Regulations.  Section 7.8.6 of the Personnel Regulations provides that a change in an employee's status from probationary status to that of regular employee "will be processed prior to the expiration of the probationary period through a notice to the employee accompanied by the final evaluation." (Docket No. 48, Attach. 1, at 45.) Simply because Portalatín was advised that he would be appointed to the position of

CIVIL 03-1038 (JAG)                         21

Manager of Housing Administration on September 7, 2000, one day before the ban on personnel transactions, does not mean that the probationary period ended; it simply means his status changed from probationary to regular employee. Section 7.8.6, however, requires that the" notice to the employee [be] accompanied by the final evaluation." (Docket No. 48, Attach. 1, at 45.)  Nothing in the record shows that such an evaluation accompanied the letter Portalatín received from Huertas. If he received such an evaluation prior to September 8, 2000, the beginning of electoral ban on personnel transactions, then his appointment to the position falls within section 7.8.6 of the Personnel Regulations.  Since the record does not show that an evaluation accompanied his notice, then his status change from probationary to regular employee is incomplete and illegal.

The accreditation of Portalatín's time from his work in the trust position of Assistant to the Executive Director of the Housing Corporation could not be accredited to his probationary period for Manager of Housing Administration regardless of whether or not the probationary period was appropriate.  Section 7.8.10 provides that for such an accreditation to be satisfactory, not only must the person perform all the "normal duties of the position during the complete time period in question" but must also, "at the time of said designation [meet] the minimum requirements for the position." (Id. at 46.)  Although it is uncontested Portalatín served all the duties of Manager of Housing Administration while he was Assistant to the Executive Director of the Housing Corporation, the accreditation

CIVIL 03-1038 (JAG)                    22

was rendered null by the fact that he did not meet the minimum requirements for the position of Manager of Housing Administration.

Third, defendants state that "even if" the time accredited was appropriate, it would still be considered null because the probationary period would end October 3, 2000, and would fall within the ban on personnel transactions during the pre and post election period, requiring the authorization of an OCALARH administrator.  I agree.

Special Regulatory Letter No. 1-2000 makes clear there are very few exceptions to the pre and post election ban on personnel transactions.  Among the personnel actions specifically prohibited are "Promotions, Demotions and Transfers." (Docket No. 41, Attach. 4, at 22, ¶ III, item 3.)  Appointing authorities are allowed to perform final employee evaluations during the probationary period, but personnel actions taken in reaction to those evaluations must be authorized by the OCALARH administrator.  (Id. at 26, ¶ IV, § B, item 3.)

Portalatín was given his status change from probationary to regular employee before the electoral ban on personnel transactions began.  However, there is nothing in the record indicating that Portalatín ever received an employee evaluation along with his notice that he had been appointed to the position of Manager of Housing Administration either before or after the electoral ban on personnel transactions.  If Portalatín received an employee evaluation before the electoral ban, along with his letter notifying him his status had changed from probationary to regular employee,

CIVIL 03-1038 (JAG)                    23

then there would be no need to obtain authorization from an OCALARH administrator.  Since the record does not show an evaluation was received at all, either before or after the electoral ban, then Portalatín's promotion to Manager of Housing Administration would need to be authorized by an OCALARH administrator. Since such an authorization is also missing from the record, then it is apparent Portalatin's appointment to the position of Manager of Housing Administration is illegal and null.

   B.  Claims Under the Due Process Clause of the Fourteenth Amendment

   In their "Motion for Summary Judgment," the defendants contend Portalatín's claim against them regarding his rights to due process under the Fourteenth Amendment of the United States Constitution should be dismissed because Portalatín does not have a property interest in his position at the Housing Corporation.  In his "Opposition to the Motion for Summary Judgment," Portalatín failed to contest defendants' allegations that his Fourteenth Amendment right to due process had not been violated.  I must therefore assume, as defendants no doubt did when they wrote their "Reply to Plaintiff's Opposition to Motion for Summary Judgment," that Portalatín has conceded this claim and no longer wishes to proceed with it.  See Local Rule 56(c).  It is apparent that even if Portalatín had followed Local Rule 56(c), he would not have a claim under the Due Process Clause of the Fourteenth Amendment.

CIVIL 03-1038 (JAG)                    24

The Fourteenth Amendment of the United States Constitution guarantees public employees who have a property interest in continued employment the right to a hearing before they are discharged; this property interest is created by existing rules such as state law, not the Constitution of the United States. See Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).  Under Puerto Rico law, any property interest associated with a career position is render null if a violation of the Personnel Act attends the filling of the position.  Kauffman v. P. R. Tel. Co., 841 F.2d 1169, 1173 (1st Cir. 1988); Sueiro Vázquez v. Torregrosa De la Rosa, 380 F.Supp. 2d 63, 69 (D.P.R. 2005). Although the Housing Corporation is excluded from the Personnel Act under section 1338, public employees hired for career positions in violation of agency regulations promulgated under the Act similarly cannot claim a property right to an expectation of continued employment because their career appointments are null. Vélez Rivera v. Agosto Alicea, 334 F. Supp. 2d 72, 89 (D.P.R. 2004) (quoting Kauffman v. P.R. Tel. Co., 841 F.2d at 1173).

Portalatin's position as Manager of Housing Administration was indeed a career position creating a property interest protected by the Fourteenth Amendment.  However, since Portalatín was hired in violation of the Personnel Regulations, that property interest is null.  Therefore, even though Portalatín was

CIVIL 03-1038 (JAG)                            25

granted a hearing before his termination, he was not entitled to one because he had

no property interest in his continued employment.

Therefore, Portalatín's Fourteenth Amendment claim should be dismissed.

C.  Qualified Immunity

In defendants' motion for summary judgment, Alicea argues he should be

entitled to qualified immunity because he violated no clearly established law in

discharging Portalatín and his actions were objectively reasonable in light of the

information regarding Portalatín's appointment.

> We use a three-part test to determine whether an
> official is entitled to qualified immunity,  following the
> guidance provided by the Supreme Court.  The threshold
> inquiry is whether the plaintiff's allegations, if true,
> establish a constitutional violation. The second question is
> whether the right was clearly established at the time of the
> alleged violation. That inquiry is necessary because officers
> should be on notice that their conduct is unlawful before
> they are subject to suit. The third is whether a reasonable
> officer, similarly situated, would understand that the
> challenged conduct violated that established right.   The
> question of whether a right is clearly established is an
> issue of law for the court to decide.  The reasonableness
> inquiry is also a legal determination, although it may entail
> preliminary factual determinations if there are disputed
> material facts (which should be left for a jury).

Suboh v. Dist. Att'y Office, 298 F.3d 81, 90 (1ˢᵗ Cir.2002) (citations omitted).

Since Portalatín has failed to present a prima facie case for political

discrimination and defendants have successfully shown they would have terminated

his employment regardless of his political affiliation, then my analysis ends at the

CIVIL 03-1038 (JAG)                    26

threshold inquiry.   Portalatín's failure to establish there was a constitutional violation obviates the need to address Alicea's claim of qualified immunity. Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005).

CONCLUSION

In view of the above, I recommend that defendants' motion for summary judgment (Docket No. 40) be GRANTED.

Plaintiff Portalatín has presented insufficient evidence to establish a prima facie case of political discrimination under 42 U.S.C. § 1983.  Defendants, on the other hand, have successfully shown they would have terminated Portalatín from his position as Manager of Housing Administration regardless of his political affiliation.  Portalatín's Due Process claim under the Fourteenth Amendment of the Constitution should be properly dismissed because Portalatín had no property interest in his continued employment as Manager of Housing Administration and I need not venture into the applicability of qualified immunity to defendant Alicea because there has been no constitutional violation.

Under the provisions of Rule 72(d), Local Rules District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate

CIVIL 03-1038 (JAG)                     27

review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F. 2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980)

At San Juan, Puerto Rico, this 18th day of October, 2005.


S/ JUSTO ARENAS
Chief United States Magistrate Judge